**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| ROSHA CHADWICK, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 4:15-CV-00129-CAN |
| v. | § | |
| | § | |
| CAROLYN W. COLVIN, COMMISSIONER | § | |
| OF SOCIAL SECURITY | § | |
| ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff brings this appeal under 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security ("Commissioner") denying her claim for

disability insurance benefits [Dkt. 8]. After reviewing the Briefs submitted by the Parties

[Dkts. 8; 9; 10], as well as the evidence contained in the Administrative Record, the Court finds

that the Commissioner's decision should be **AFFIRMED**.

## BACKGROUND

### I.    *Procedural History of the Case*

On May 10, 2011,[1] Rosha Chadwick ("Plaintiff") filed a Title II application for disability

insurance benefits, alleging disability beginning March 1, 2011 [TR at 174]. Plaintiff's claim

---

[1] The Disability Determination Transmittals, October 17, 2012 Oral Hearing Transcript, February 4, 2013 Oral Hearing Transcript, Administrative Law Judge Hearing Decision, and the Commissioner's brief all refer to the protective filing date of the application for disability insurance benefits as May 5, 2011 [TR at 83–85, 52, 44, 26, Dkt. 9]. However, the actual application for Disability Insurance Benefits is dated May 10, 2011 [TR at 174, 178]. Notwithstanding, this discrepancy is nondispositive, and the Court herein refers to the date of the Application for Disability Insurance Benefits as May 10, 2011.

was initially denied on September 19, 2011, and again upon reconsideration on March 30, 2012.[2] *Id.* at 87, 26. Plaintiff filed a written request for hearing on May 23, 2012. *Id.* at 98.

The ALJ conducted a hearing on October 17, 2012. *Id.* Plaintiff and vocational expert Russell Bowden both testified at hearing. *Id.* at 50, 54-75, 75-81. Plaintiff was represented by counsel at hearing. *Id.* at 50, 52. The ALJ ordered a supplemental hearing to take place on February 4, 2013. *Id.* at 18, 140. At the supplemental hearing, Plaintiff appeared and testified, as did Dr. Howard H. McClure, Jr., M.D. an impartial medical expert. *Id.* at 42-49.

On May 28, 2013, the ALJ issued his decision and found Plaintiff not disabled. *Id.* at 35-36. The ALJ denied benefits under step four of the sequential analysis finding that Plaintiff retained the residual functional capacity to perform her past relevant work as a pharmacist. *Id.* On December 24, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. *Id.* at 1-7. Thereafter, Plaintiff timely appealed the Commissioner's decision to this Court pursuant to 42 U.S.C. § 405(g) on February 24, 2015.

## II. *Statement of Relevant Facts*

### 1. *Age, Education, and Work Experience*

Plaintiff was born on June 15, 1956, making her fifty-five years of age at the time of filing her application and fifty-eight years of age on the date of the Commissioner's final decision [TR at 54]. Plaintiff completed high school and obtained a bachelor's of science degree in pharmaceutical medicine. *Id.* at 55. Plaintiff's past relevant work experience includes twenty-five years as the Director of Pharmacy at the Denton State Supported Living Center.

---

[2] The Court notes an additional discrepancy as to the date of the reconsideration decision. The Disability Reconsideration Notice itself is not dated [TR at 93]. The Court Transcript Index refers to the date of the Reconsideration Notice as March 27, 2012, and the Administrative Law Judge Hearing Decision dates the Reconsideration Notice as March 30, 2012 [Dkt. 5, TR at 26]. This date is non-dispositive, and the Court herein refers to the date of the Disability Reconsideration Notice as March 30, 2012.

*Id.* at 476. She retired from this position in February 2011. *Id.* Plaintiff asserts that her onset date of disability is March 1, 2011. *Id.* at 52.

### 2. *Medical Record Evidence*

#### a. *Physical Impairments*

On December 7, 2010, Plaintiff saw rheumatologist Dr. Maureen Mayes, M.D. ("Dr. Mayes") [TR at 369]. Dr. Mayes' "impression" included cutaneous systemic sclerosis with Raynaud's syndrome, mild sclerodactyly, digital ulcers, and obesity. *Id.* Dr. Mayes noted that Plaintiff's musculoskeletal examination showed no signs of synovitis in any of her small joints of the hands, wrists, elbows, knees, ankles, or feet. *Id.* at 323. Plaintiff saw Dr. Mayes again on September 19, 2012. *Id.* at 606. At that time, Dr. Mayes' impression revealed "mild limited scleroderma with minimal sclerodactyly, history of digital ulcers, arthralgias controlled with low-dose Prednisone." *Id.*

On August 13, 2011, state agency physician, Mahmood Panjwani, M.D. ("Dr. Panjwani"), conducted a consultative examination. *Id.* at 444. Plaintiff's chief complaints were scleroderma with associated symptoms, particularly joint pains. *Id.* Plaintiff reported to Dr. Panjwani that she experienced joint pain which particularly manifested in cold weather, and that she was previously diagnosed with Raynaud's syndrome "which gets very painful." *Id.* at 440, 444. Plaintiff also reported to Dr. Panjwani that symptoms of her present illness affected her ability to work. *Id.* at 444.

On September 15, 2011, James Wright, M.D. ("Dr. Wright") completed a Physical Residual Functional Capacity Assessment. *Id.* at 456. He opined that Plaintiff could perform light work. *Id.* at 456-463. Dr. Frederick Cremona, M.D. ("Dr. Cremona") completed a Case Assessment Form Analysis on March 26, 2012. *Id.* at 481. In this Case Assessment Form

Analysis, Dr. Cremona concurred with Dr. Wright's assessment that Plaintiff could perform light work. *Id.*

On May 18, 2012, Plaintiff was treated at Medical Clinic of North Texas by Dr. Nuha Said, M.D. ("Dr. Said"). *Id.* at 533. Dr. Said noted that Plaintiff's x-rays demonstrated the presence of some osteoarthritis. *Id.*

### b. *Mental Impairments*

On February 23, 2012, Plaintiff saw Randall Rattan, Ph.D., ("Dr. Rattan") for a Clinical Interview with Mental Status Examination [TR at 475-78]. Plaintiff claimed she was depressed due to the fact that her physical impairments prevented her from working. *Id.* Plaintiff stated that her depression and physical symptoms also negatively influenced her social and occupational function, as well as her ability to complete activities of daily living. *Id.* Dr. Rattan observed no speech-based evidence of thought disorder, and reported Plaintiff's emotional expression was within normal limits, and attention and concentration were average. *Id.* at 477-78. Dr. Rattan diagnosed Plaintiff with adjustment disorder with depressed mood. *Id.* at 478. He assigned a global assessment of functioning ("GAF") score of 60. *Id.* With a GAF of 60, Dr. Rattan opined she was capable of understanding the meaning of filing for benefits and is capable of managing her finances. *Id.*

Based on Dr. Rattan's written examination report, Susan Posey, Psy.D. ("Dr. Posey") completed a Psychiatric Review Technique form dated March 26, 2012. *Id.* at 492. Dr. Posey evaluated "paragraph B criteria" under Listing 12.00C of 20 C.F.R. Part 404, Subpart P, Appendix 1, and opined that Plaintiff had a non-severe impairment with "mild" limitations in the first three functional areas: daily living; social functioning; and concentration, persistence or pace. *Id.* Dr. Posey found no limitations in the fourth functional area, episodes of

decompensation. *Id.* Dr. Posey's ultimate conclusion reads "nonsevere limitations…the clmt is somewhat limited by sadjustment [sic] disorder, but the impact of these sx [sic] does not wholly compromise the ability to function independently, appropriately, and effectively on a sustained basis. Functional limitations are less then marked. The alleged severity and limited effects from the impairments are not wholly supported." *Id.* at 494.

### 3. Hearing Testimony

#### a. Plaintiff's Testimony

At hearing, Plaintiff testified that she regularly experienced pain and swelling in her legs and feet [TR at 55]. Plaintiff testified it was difficult for her to stand or sit in a chair for a long period of time, and she must periodically elevate her feet and legs in order to alleviate the pain and swelling. *Id.* More specifically, Plaintiff testified that she could neither stand and walk for six hours out of an eight-hour day, nor could she stand and walk for two hours total in an eight-hour day. *Id.* at 71. She testified that she could only sit in an office chair in a normal position without elevating her legs for an hour-and-a-half to two hours. *Id.* at 72. Plaintiff also testified that she experienced pain in her fingers and sensitivity in her hands. *Id.* Plaintiff stated that she suffered from severe fatigue that did not allow her to take long trips to the grocery store. *Id.* at 58. Plaintiff attempted to remediate the effects of her conditions by medication and steroids, but her treating physician discontinued such medications due to concerns of continued long-term use. *Id.* at 56, 67.

The pain Plaintiff experienced from her conditions is alleged to have prevented her from being able to concentrate at a level she would prefer for performing her duties as a pharmacist. *Id.* at 57. Plaintiff stated that she had a "very big concern" that, while performing her duties as a pharmacist, her concentration may lapse and that she might make a mistake in filling a

prescription.  *Id.*  at 75.  Plaintiff testified that she "knew [she] wasn't filling [prescriptions] and thinking as clearly" because her thoughts were preoccupied with how tired she was.  *Id.*  She also testified that a mistake made by a pharmacist could kill someone.  *Id.*

### b.  *Vocational Expert Testimony*

At hearing, Mr. Bowden testified as a vocational expert [TR at 75].  The ALJ asked Mr. Bowden to describe Plaintiff's work history.  *Id.* at 76.  Mr. Bowden testified that Plaintiff had worked as a pharmacist for more than twenty-three years at the time of the hearing.  *Id.* at 76.  Mr. Bowden described the work of a pharmacist as "highly skilled; SVP[3] of 7; light in exertional requirements." [4]  *Id.*  Mr. Bowden opined that in light of her skill set Plaintiff also had the ability to work as a data entry clerk, which has a sedentary level of exertion.  *Id.* at 76-77.  The ALJ then asked Mr. Bowden a hypothetical question that incorporated Plaintiff's age, work history, and education, as well as the additional limitations of lifting up to twenty pounds occasionally, less than ten pounds frequently, and only being able to sit for six hours out of an

---

[3]SVP stands for "specific vocational preparation."  SVP is defined in the Dictionary of Occupational Titles ("DOT") as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  DOT, Appendix C, page 1009 (4th ed. 1991).  Using the skill level definitions in 20 C.F.R. § 404.1568 and § 416.968, unskilled work corresponds to an SVP of 1–2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5–9 in the DOT. Social Security Ruling 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000).

[4] Each job classification in the national economy is broken down into an exertion level: Sedentary, Light, Medium, Heavy, and Very Heavy.  20 C.F.R. § 404.1567.  Sedentary, Light, and Medium work are defined as follows:

    (a) Sedentary work.  Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

    (b) Light work.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

    (c) Medium work.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work.  Id.

eight hour day. *Id.* at 77. Bowden testified that if the hypothetical individual had a "light" residual functional capacity, that individual would have the ability to perform Plaintiff's past work as a pharmacist. *Id.* at 78. The ALJ then asked Mr. Bowden whether a hypothetical individual with Plaintiff's background, who had the capacity for sedentary work, could perform Plaintiff's past work. *Id.* Mr. Bowden answered in the negative. *Id.* Mr. Bowden testified that such an individual, limited to sedentary work, could not work as a pharmacist, but could work as a data entry clerk. *Id.* The ALJ asked Mr. Bowden a third hypothetical question; whether a hypothetical individual, who could lift and carry ten pounds or less, and could only stand, sit, or walk for two hours out of an eight hour day, would preclude Plaintiff's past work as a pharmacist. *Id.* Mr. Bowden testified that this hypothetical individual would be precluded from all competitive employment. *Id.*

### III.    *Findings of the ALJ*

#### 1.    *Sequential Evaluation Process*

Pursuant to the statutory provisions governing disability determinations, the Commissioner has promulgated regulations that establish a five-step process to determine whether a claimant suffers from a disability. 20 C.F.R. § 404.1520. First, a claimant who is engaged in substantial gainful employment at the time of his disability claim is not disabled. 20 C.F.R. § 404.1520(b). Second, the claimant is not disabled if his alleged impairment is not severe, without consideration of his residual functional capacity, age, education, or work experience. 20 C.F.R. § 404.1520(c). Third, if the alleged impairment is severe, the claimant is considered disabled if his impairment corresponds to a listed impairment in 20 C.F.R., Part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d). Fourth, a claimant with a severe impairment that does not correspond to a listed impairment is not considered to be disabled if he is capable of

performing his past work. 20 C.F.R. § 404.1520(e). Finally, a claimant who cannot return to his past work is not disabled if he has the residual functional capacity to engage in work available in the national economy. 20 C.F.R. § 404.1520(f). Under the first four steps of the analysis, the burden lies with the claimant to prove disability and at the last step the burden shifts to the Commissioner. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). If at any step the Commissioner finds that the claimant is or is not disabled, the inquiry terminates. *Id.*

### 2. ALJ's Disability Determination

After hearing testimony and conducting a review of the facts of Plaintiff's case, the ALJ made the following sequential evaluation. At step one, the ALJ found that Plaintiff worked after the alleged disability onset date, March 1, 2011, but such work did not rise to the level of substantial gainful activity [TR at 28]. At step two, the ALJ determined that Plaintiff had the severe impairments of scleroderma, Raynaud's syndrome, degenerative joint disease of the bilateral knees, obesity, and a history of hypothyroidism. *Id.* The ALJ also found, at step two, that Plaintiff did not have the severe mental impairment of adjustment disorder. *Id.* At step three, the ALJ found that Plaintiff's impairments, or combination of impairments, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 30-31. At step four, the ALJ found that Plaintiff had the residual functional capacity to perform light work. *Id.* at 31. The ALJ limited Plaintiff to no more than occasionally stooping, kneeling, crouching, and climbing ramps or stairs. *Id.* The ALJ also included the limitation that Plaintiff is not able to climb ladders, ropes, or scaffolds. *Id.* At all times from March 1, 2011, to the date of the ALJ's decision, the ALJ found that Plaintiff retained the residual functional capacity to lift and/or carry twenty pounds occasionally, lift and/or carry ten pounds frequently, stand/walk for six hours in an eight-hour workday, and sit for six hours in

an eight-hour workday. *Id.* Continuing the step four analysis, the ALJ then determined that Plaintiff is able to perform her past relevant work. *Id.* at 35. Based on this determination, the ALJ concluded Plaintiff was not disabled from March 1, 2011 through May 28, 2013, the date of the ALJ's decision. *Id.* at 36.

## STANDARD OF REVIEW

In an appeal under § 405(g), this Court must review the Commissioner's decision to determine whether there is substantial evidence in the record to support the Commissioner's factual findings and whether the Commissioner applied the proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985); *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). This Court cannot reweigh the evidence or substitute its judgment for that of the Commissioner. *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1995). Additionally, any conflicts in the evidence, including the medical evidence, are resolved by the ALJ, not the reviewing court. *Carry v. Heckler*, 750 F.2d 479, 484 (5th Cir. 1985).

The legal standard for determining disability under Titles II and XVI of the Act is whether the claimant is unable to perform substantial gainful activity for at least twelve months because of a medically determinable impairment. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *see also Cook*, 750 F.2d at 393. "Substantial gainful activity" is determined by a five-step sequential evaluation process, as described above. 20 C.F.R. § 404.1520(a)(4).

## ANALYSIS

On appeal, Plaintiff argues the ALJ erred in two ways: (1) the ALJ failed to explain the weight he gave to a nontreating physician who evaluated Plaintiff for a mental impairment; and

(2) the ALJ failed to consider Plaintiff's osteoarthritis of the hands and polydactyly at any stage of the sequential analysis [Dkt. 8 at 1]. Plaintiff further argues that this Court's review of the ALJ's decision is limited to whether the ALJ applied the appropriate legal standards in regards to Plaintiff's first and second issue [Dkt. 10 at 2-3, 7]. While the Commissioner contends that the Court's focus should be whether substantial evidence supports the ALJ's decision that Plaintiff was not disabled [Dkt. 9 at 8].[5]

## I. *Weight Given to Nontreating Physician's Opinion*

Plaintiff argues the ALJ did not apply the appropriate legal standard by failing to explain the weight given to Dr. Rattan's examination report [Dkt. 8 at 11]. It is well-settled in the Fifth Circuit that "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with…other substantial evidence.'" *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (citing *Martinez v. Chater,* 64 F.3d 172, 173 (5th Cir.1995); 20 C.F.R. § 404.1527(d)(2)). The regulations define a treating physician as one "who provides [the patient], or has provided [the patient], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the patient]." 20 C.F.R. § 404.1502. The regulations define "nontreating" physician as a medical source who has examined the patient but does not have, or did not have, an ongoing treatment relationship with the patient. 20 C.F.R. § 404.1502. A consultative examiner is generally analyzed under the

---

[5] The Parties seemingly disagree on the scope of this Court's review. To the extent that Plaintiff and Commissioner argue for either a review of the applicable legal standards or substantial evidence, to the exclusion of the other, each has overly narrowed this Court's standard of review. *See Greenspan*, 38 F.3d at 237 (construing Plaintiff's argument that "the ALJ erred by giving no or little weight to the opinion of her treating physicians" to require a review of whether the ALJ applied the proper legal standard and whether the ALJ's conclusion was based upon substantial evidence). The Court herein reviews both of Plaintiff's issues on appeal to determine whether the ALJ applied the appropriate legal standards and whether the ALJ's finding of non-disability is supported by the substantial evidence.

regulatory definition of a "nontreating" physician. *See* 20 C.F.R. § 404.1502 ("The term [nontreating physician] includes an acceptable medical source who is a consultative examiner…"); *see Andrews v. Astrue*, 917 F. Supp. 2d 624, 637 (N.D. Tex. 2013). Consulting or nontreating physicians are not entitled to the same controlling weight as treating doctors. *See Hernandez*, 278 F. App'x. at 338. The ALJ must nonetheless apply the factors listed in sections 404.1527(c) and 416.927(c)(2) to determine what weight to give to such opinions. 20 C.F.R. §§ 404.1527(c), 416.927(c)(2).

### 1. Dr. Rattan's Opinion

Here, Dr. Rattan was a consultative examiner, which is treated under the regulatory definition as a nontreating physician. *See* 20 C.F.R. § 404.1502. Therefore, the ALJ was not required to give Dr. Rattan's opinion controlling weight. *See Hernandez*, 278 F. App'x. at 338. The ALJ was, however, required to articulate the weight given to Dr. Rattan's opinion. *See Andrews*, 917 F. Supp. 2d at 638; *See* 20 C.F.R. §§ 404.1527(e)(ii), 416.927(e)(ii). When the ALJ considers medical opinions he must explain the weight he afforded each medical opinion, regardless of its source. *See Andrews*, 917 F. Supp. 2d at 638; *see also* 20 C.F.R. §§ 404.1527(e)(ii), 416.927(e)(ii). The Regulations explain this requirement in sections 404.1527(e)(ii) and 416.927(e)(ii):

> Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant…as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources.

The Commissioner argues the ALJ "thoroughly explained how he reached his finding…" and therefore, "the Court must affirm the ALJ's well-reasoned decision" [Dkt. 9 at 4, 8]. However, the Commissioner does not address the clear failure by the ALJ to explain the weight given to

Dr. Rattan's opinions. *See Andrews*, 917 F. Supp. 2d at 638; *see* 20 C.F.R. §§ 404.1527(e)(ii), 416.927(e)(ii).

### 2. *Harmless Error*

Notwithstanding the ALJ's failure to explain the weight he gave to Dr. Rattan's opinion, remand is only warranted if such error casts doubt on the existence of substantial evidence. *See Andrews*, 917 F. Supp. 2d at 638. Indeed, not every error warrants reversal or remand. *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006). The Fifth Circuit has held that procedural perfection in administrative proceedings is not required and any variation amounts to harmless error that is not grounds for reversal, unless the substantial rights of a party have been affected. *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *Audler*, 501 F.3d at 448. "[P]rocedural improprieties ... will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Alexander v. Astrue*, 412 F. App'x 719, 722 (5th Cir. 2011) (quoting *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988) (upholding the ALJ's non-disability finding because alleged error did not "render the ALJ's determination unsupported by substantial evidence").

Harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette*, 466 F. Supp. 2d at 816 (citing *Frank v. Barnhart*, 326 F.3d at 622; *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989) (error is harmless unless there is reason to think that remand might lead to a different result)). Thus, if the Court's review of the record reveals the existence of substantial evidence supporting the ALJ's decision, then the ALJ's error in not explaining the weight he gave to a nontreating physician is harmless. *See id* (citing *Hammond*, 124 F. App'x at 851-52 (stating that the ALJ, in evaluating medical opinions to determine the severity of the claimant's impairment, "likely made

the same fact-based judgments that form the basis of [the court's] refusal to overturn his decision on substantial evidence review")).  Plaintiff argues the ALJ's error with respect to Dr. Rattan was harmful because if adopted in its entirety, Dr. Rattan's report (and opinions contained therein), reflect Plaintiff had a severe mental impairment [Dkt. 8 at 12].  Specifically, Plaintiff argues Dr. Rattan's finding that Plaintiff had a GAF score of 60 and "agreement" that Plaintiff could not engage in complex tasks and finding that depression interfered with Plaintiff's social functioning, occupational functioning and performing daily living activities conflicts with the ALJ's finding that Plaintiff did not have a severe mental impairment.

As an initial matter, the Court notes that in his decision, the ALJ reviewed Dr. Rattan's report in considerable depth [TR at 28-29].  He notes the following relevant portions of Dr. Rattan's report:  Plaintiff reported to Dr. Rattan that her depression symptoms were negatively influencing her social and occupational function; Plaintiff's thought process was logical, sequential, and coherent; Plaintiff had average attention span and concentration; Plaintiff had no deficits in judgment; and Plaintiff a GAF score of 60, which based upon DSM IV indicates Plaintiff would be expected to have moderate symptoms in social or occupational functioning.  *Id.* at 29.  Plaintiff concedes that "Dr. Rattan did not explicitly state that [Plaintiff's] adjustment disorder with depression was 'severe,'"[Dkt. 8 at 12] but rather argues that Dr. Rattan's assignment of a GAF score of 60 indicates moderate difficulty in social, occupational, or school functioning exceeds the *de minimus* definition of impairment at step 2 [TR at 478].

Plaintiff  further argues the ALJ "never resolved the conflict between Dr. Rattan's opinion that [Plaintiff's] adjustment disorder and depression affected her ability to work and his own finding that the impairments were non-severe" [Dkt. 8 at 13 (footnotes omitted)].  Contrary to Plaintiff's assertion, Dr. Rattan never expressed the opinion that Plaintiff's adjustment

disorder affected her ability to work [TR at 478].[6]  Dr. Rattan merely noted Plaintiff appeared to have provided a reliable account of her history and current functioning; this is not an endorsement and/or an affirmative agreement by Dr. Rattan to the existence of Plaintiff's subjective complaints.

Thus, the only evidence Plaintiff points to which may potentially be construed as conflicting is the GAF score [Dkt. 8 at 12].  However, a GAF score alone is not determinative of Plaintiff's ability to work.  *Andrews*, 917 F. Supp. 2d at 638.  Federal courts have repeatedly, specifically declined to find a direct link or correlation between a claimant's GAF score and his or her ability or inability to work. *See e.g. Andrews*, 917 F. Supp. 2d at 638 (citing 65 FED.REG. 50746, 50764-65 (Aug. 21, 2000) (declining to endorse the GAF scale for use in Social Security and SSI disability programs and stating that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings"). This Court similarly declines to find such a direct link. Particularly, whereas here, the remaining medical evidence including Dr. Posey's findings reflect that Plaintiff's alleged mental impairments are "nonsevere" and that Plaintiff's alleged limitations from same are not wholly supported by the record [TR at 494].[7]

---

[6] Plaintiff cites to [TR at 478], which is the last page of Dr. Rattan's report. However, there is nothing on that page to suggest that Dr. Rattan opined as to Plaintiff's ability to work. The only evidence that could be construed as standing for that proposition is the fact that Dr. Rattan diagnosed Plaintiff with a "Current GAF = 60". *Id.*

[7] In support of Plaintiff's position, Plaintiff cites to each of *Nicaragua* and *Scott*, asserting that such authority demands a different result and supports her claim that the ALJ was required to resolve the conflict between Dr. Rattan's GAF score of 60 and the ALJ's finding of nonseverity. *Nicaragua v. Colvin*, 3:12-CV-2109-G BN, 2013 WL 4647698, at *6 (N.D. Tex. Aug. 29, 2013); *Scott v. Barnhart*, 332 F. Supp. 2d 869 (D. Md. 2004). *Nicaragua* is distinguishable from the case at bar.  Therein, the ALJ failed to consider the opinions of not one, but two consultative examiners, making only a passing reference to one of the examiners and wholly ignoring the existence of the other.  *Nicaragua* at *6-*7. The Court ultimately concluded that the failure to consider the Section 404.1527 factors as to the first examiner, and the express omission of the second examiner's statements was prejudicial error. *Id.* Here, the ALJ did not wholly fail to consider Dr. Rattan's report, nor include only a passing reference.  The ALJ, while erring in his failure to discuss the Section 404.1527 factors, did substantively discuss the report before ultimately finding Plaintiff did not suffer from a severe mental impairment [TR at 28-30].  *Scott* is similarly distinguishable.  While Plaintiff correctly represents that the *Scott* court remanded the decision of the ALJ. Plaintiff's discussion fails to make clear that remand was not based solely on the GAF score, but also upon the physician's express characterization of the claimant's disability as "severe." *Scott,* 332 F. Supp. 2d at 878.

In addition, as previously noted, the ALJ extensively discussed Dr. Rattan's findings. Plaintiff merely requests this Court remand the case for further consideration because the ALJ "failed to explain what weight, if any, he gave to..." Dr. Rattan [Dkt. 8 at 11]. Plaintiff cannot demonstrate, however, that affording Dr. Rattan greater weight would lead to a finding of disability. Even if the ALJ had properly explained the weight he gave to Dr. Rattan's opinion, it is not conceivable that he would have reached a different result and found Plaintiff disabled. Therefore, the ALJ's error in failing to explain the weight he gave to Dr. Rattan's report is harmless.

II.     *Whether the ALJ Properly Considered Plaintiff's Osteoarthritis of the Hands and Polydactyly*

At step two, the ALJ found that Plaintiff has the severe impairments of scleroderma, Raynaud's syndrome, degenerative joint disease of the bilateral knees, obesity, and history of hypothyroidism [TR at 28]. Notably, other alleged impairments, "osteoarthritis of the hands and polydactyly," were not included [Dkt. 8 at 14]. Based upon the omission, Plaintiff argues the ALJ neglected to consider all of Plaintiff's potentially disabling impairments, singly and in combination [Dkt. 8 at 14]. Specifically, Plaintiff argues Regulation 20 C.F.R. § 404.1523 required the ALJ to consider all alleged impairments throughout the disability determination process, and that the ALJ did not comply with this duty because he never mentioned her osteoarthritis of the hands or her polydactyly in his analysis of Plaintiff's severe impairments at step two, nor in his analysis of Plaintiff residual functional capacity at step four. *Id.* In response, the Commissioner argues that the ALJ did consider all of Plaintiff's "hand complaints" [Dkt. 9 at 9]. The Commissioner cites portions of the ALJ's decision that indicate the ALJ thoroughly considered the entire medical record, Plaintiff's own subjective complaints regarding her osteoarthritis of the hands and polydactyly, as well as medical expert hearing testimony [Dkt. 9

at 8-11]. The Commissioner further argues Plaintiff did not demonstrate a reversible error at step four because Plaintiff failed to show error in the ALJ's determination of her residual functional capacity as a result of his alleged failure to consider all alleged impairments. *Id.* at 12.

### 1. *Consideration of Alleged Impairments*

Social Security benefits based on disability are awarded only for "impairments," meaning abnormalities that can affect a person's ability to engage in substantial gainful activity. *Veal v. Soc. Sec. Admin.*, 618 F. Supp. 2d 600, 606 (E.D. Tex. 2009). The abnormality must be such that it can be shown by medically acceptable clinical and laboratory diagnostic techniques. *Id.* It must be established by medical evidence, as opposed to a claimant's subjective statements or symptoms. *Id* (citing 20 C.F.R. § 416.908). Mere notations of subjective complaints fall short of "medically acceptable clinical and laboratory diagnostic techniques" required to establish an impairment. *Id* (citing 20 C.F.R. § 416.908).

In determining whether a claiman's physical or mental impairments are of a sufficient medical severity, as would be the basis of eligibility under the law, the ALJ is required to consider the combined effects of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. *Zeno v. Barnhart*, 1:03-CV-649, 2005 WL 588223, at *4 (E.D. Tex. Feb. 4, 2005) (citing 20 C.F.R. § 404.1523; *Crowley v. Apfel*, 197 F.3d 194, 197 (5th Cir.1999); *Anthony v. Sullivan,* 954 F.2d 289, 293 (5th Cir.1992)). If the ALJ finds a medically severe combination of impairments, "the combined impact of the impairments will be considered throughout the disability determination process." *Zeno*, 2005 WL 588223, at *4 (citing 20 C.F.R. § 404.1523 (2004)); *Loza*, 219 F.3d at 393; *Horton v. Barnhart*, No. 1:03cv222 at 14-15 (E.D. Tex. Dec. 1, 2004)).

With this core concept in mind, it is clear that the ALJ must consider all the record evidence and cannot "pick and choose" only the evidence that supports his position. *Loza*, 219 F.3d at 393-94. A just and valid administrative determination requires at a minimum consideration of all alleged impairments. *See Bornette v. Barnhart*, 466 F. Supp. 2d 811, 814-15 (E.D. Tex. 2006) (citing *Loza*, 219 F.3d at 393). The Commissioner acknowledges and embraces this concept through an official regulation which states:

> We will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity [to be the basis of eligibility under the law]. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.

20 C.F.R. § 404.1523. When the ALJ fails to take into account all relevant evidence, a reviewing court deems the ALJ's decision to be unsupported by substantial evidence. *Veal*, 618 F. Supp. 2d at 606 (citing *Myers,* 238 F.3d at 621 (finding that substantial evidence did not support the ALJ's decision where the ALJ summarily rejected the opinions of a treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant)).

However, failure to expressly mention a relevant item of evidence does not mean that it was not considered. *Veal*, 618 F. Supp. 2d at 606 (citing *Wildbur v. ARCO Chemical Co*., 974 F.2d 631, 644 (5th Cir.1992) (a court's failure to list each fact and argument raised by the plaintiff does not mean that court did not consider each fact and argument)); *C.f. Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (rejecting the plaintiff's argument that "the ALJ must articulate specifically the evidence that supported his decision and discuss the evidence that was rejected" and finding such a "rigid approach…unnecessary"). Even when an ALJ fails to follow formalistic rules in his articulation of certain evidence, the fairness and accuracy that this process

is designed to ensure is not compromised.  *Falco*, 27 F.3d at 163.  Further, nothing in the law requires the ALJ to accept all evidence as credible, or to discuss impairments when there is no evidence that such symptoms interfere with the claimant's ability to work.  *See Veal*, 618 F. Supp. at 606-07.  Nor does the law require the ALJ to always discuss evidence that the ALJ rejected.  *See id.* (citing *Falco*, 27 F.3d at 163 (declining to require ALJ to "discuss the evidence that was rejected" when evaluating the claimant's subjective complaints of pain)).  With that background in mind, the Court now turns to Plaintiff's arguments.

### a. Plaintiff's Alleged Polydactyly

The Court first disposes of Plaintiff's contention that the ALJ did not properly consider Plaintiff's alleged polydactyly.  Plaintiff does not refer the Court to any evidence, whatsoever, establishing the existence of her alleged polydactyly [*see* Dkt. 8].  The overwhelming majority of Plaintiff's brief on her second issue is devoted to discussing her alleged osteoarthritis of the hands.  *Id.* at 14-18.  The only evidence Plaintiff cites in support of her alleged impairment of "polydactyly" is contained in a report by Dr. Said.  [Dkt. 8 at 16 n.129].  Dr. Said noted Plaintiff's "bony hypertrophy hands" in the musculoskeletal section of the physical exam [TR at 589]; however, Dr. Said notably did not include either hypertrophy or polydactyly as a chronic condition [TR at 589-90].  Further, Plaintiff herself directs the Court's attention to the ALJ's discussion of this report [Dkt. 8 at 15 n.117 (citing TR at 34)].  The ALJ specifically noted Dr. Said's finding of "bony hypertrophy in [Plaintiff's] hands" [TR at 34].  Even if the scant evidence of polydactyly in Plaintiff's medical record was enough to prove the existence of the alleged impairment, the ALJ properly considered such evidence as the law requires.  Therefore, the Court rejects Plaintiff's argument that the ALJ failed to consider this alleged impairment.

### b. Plaintiff's Alleged Osteoarthritis of the Hands

Plaintiff's further contention—that the ALJ failed to properly consider her osteoarthritis of the hands—also fails for several reasons. First, the ALJ thoroughly addressed Plaintiff's hand complaints in determining Plaintiff's residual functional capacity. *Id.* at 31-35. Second, the ALJ's finding that Plaintiff's "impairments and the impact on her ability to work are not entirely credible in light of the objective medical findings and the medical history and degree of medical treatment" is adequately supported by substantial evidence. *Id.* at 34.

In the ALJ's discussion of step four of the sequential evaluation analysis, he conducted a lengthy summary of the relevant medical evidence. *Id.* at 31-35. While the ALJ did not expressly reference "osteoarthritis of the hands," he referenced Plaintiff's medical records indicating the existence of osteoarthritis. *Id.* Specifically, the ALJ cited Dr. Panjwani's observations that Plaintiff's sensory examination was symmetrical and normal; and her handgrip was 5/5, normal, and symmetric. *Id.* at 32 (citing TR at 440-46). Moreover, Dr. Panjwani opined that Plaintiff's fine finger movements were normal, and that she had a normal ability to handle small objects and buttons on clothing. *Id.* (citing TR at 443, 446). Dr. Panjwani further noted that Plaintiff had no apparent problems with fine finger activity. *Id.* at 443.

The ALJ also noted that in September 2011, Dr. Wright reviewed Plaintiff's medical records and opined that she could perform light work. *Id.* at 33 (citing TR at 456-63). Significantly, Dr. Wright specifically found that Plaintiff had no established manipulative limitations. *Id.* at 459. By November 2011, Plaintiff's musculoskeletal examination was good, with normal range of motion in all joints, no active swelling or synovitis, no fingertip ulcerations or digital tip pitting, and she had symmetrical reflexes. *Id.* at 33 (citing TR at 470-73). In

January and February 2012, Plaintiff continued to have no active swelling or synovitis and good range of motion in all joints. *Id.* at 33 (citing TR at 546-51).

The ALJ noted that during Plaintiff's examination on May 1, 2012, the x-ray of her left hand showed mild joint space narrowing and sclerosis about the thumb metacarpal carpal articulation; but her remaining joint spaces were without significant narrowing, there were no erosive changes, and her soft tissues were unremarkable. *Id.* The ultimate impression was "only minimal degenerative change of her left thumb base." *Id.* A few weeks later, Plaintiff's musculoskeletal examination continued to show no active swelling or synovitis, and she had good range of motion in all joints. *Id.* In August 2012, Plaintiff again had no active swelling or synovitis, but had bony hypertrophy in her hands. *Id.* at 34. A month later, her skin revealed minimal sclerodactyly on each of her fingers; but Plaintiff's hand extension was normal, her fist formation was full, there were no digital tip ulcers or other dermal ulcers, and she had one or two digital pitting scars. *Id.*

After thoroughly addressing the rather benign objective medical evidence, the ALJ found that it did not support Plaintiff's allegations. *Id.* In fact, the ALJ noted that the objective clinical findings revealed no significant abnormality of any joint or joint functioning. *Id.* He further noted that her reflexes were intact, her range of motion was full and painless, and her muscle strength was normal. *Id.* After the ALJ's thorough discussion of Plaintiff's medical record, he concluded:

> After careful consideration of the medical opinions of record….[Plaintiff's] allegations concerning her impairments and the impact on her ability to work are not entirely credible in light of objective medical findings and the medical history and degree of medical treatment required. The description of the symptoms and limitations, which [Plaintiff] has provided throughout the record, has generally been unpersuasive.
> ….

> Despite [Plaintiff's] reports of generalized muscle and joint pain related to scleroderma and *arthritis*, the undersigned notes that objective clinical findings upon examinations of [Plaintiff] have revealed no significant abnormality of any joint or joint functioning…Steroid treatments appear generally to control the claimant's condition without evidence or report of significant side effects….

[TR at 34-35] (emphasis added). The ALJ explained that he gave considerable weight to the opinions of the reviewing physicians, Dr. Wright and Dr. Carmona, and the medical expert, Dr. McClure. *Id.* at 35. The ALJ notes that these three medical opinions support his finding that Plaintiff could perform some light work with no limitation on using her hands. *Id.* at 35. None of the doctors found that Plaintiff had any manipulative restrictions, and their expert medical opinions fully support the ALJ's residual functional capacity assessment and directly refute Plaintiff's claim of error. *Id.*

Further, Plaintiff has not shown that her osteoarthritis caused any limiting effects on her manipulation and, in turn, her residual functional capacity [Dkt 8 at 14]. To the contrary, the ALJ noted that Dr. Wright and Dr. Cremona both opined that Plaintiff had no manipulative limitations [TR at 33 (citing TR at 459, 481)]. The doctors' findings of no manipulative limitation directly refutes Plaintiff's alleged hand limitations due to osteoarthritis, polydactyly, or any other cause. Consistent with the reviewing physicians' opinions, Dr. McClure did not report that Plaintiff had any problems with manipulation. *Id.* at 46-48. These expert opinions provide substantial evidence supporting the ALJ's residual functional capacity finding and ultimate decision. Because Plaintiff has not shown that the ALJ erred in determining her residual functional capacity, her claim of reversible error at step four must fail.

### 2. Harmless Error

Even if the court assumes *arguendo* that the ALJ erred in not considering Plaintiff's polydactyly and/or osteoarthritis of the hands, remand would be inappropriate because such error is harmless.

#### a. Polydactyly

Even if the Court assumes the ALJ did not properly consider the effects Plaintiff's alleged polydactyly, it is inconceivable that the ALJ would have reached a different result and found Plaintiff disabled had the ALJ properly considered the polydactyly. Such an error would only constitute a basis for remand if it cast into doubt the existence of substantial evidence to support the ALJ's decision. *Alexander v. Astrue*, 412 F. App'x 719, 722 (5th Cir. 2011) (quoting *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988) (upholding the ALJ's non-disability finding because alleged error did not "render the ALJ's determination unsupported by substantial evidence").

Plaintiff argues the ALJ's "oversight" requires remand because "common sense alone suggests that the recognition of this impairment would have resulted in a further reduced [residual functional capacity]." [Dkt. 8 at 17]. The Court disagrees. Plaintiff does not present, and the record does not support, any evidence of Plaintiff's alleged polydactyly that would cast into doubt the existence of substantial evidence to support the ALJ's decision. Therefore, any error the ALJ committed by not properly evaluating Plaintiff's alleged polydactyly is harmless.

#### b. Osteoarthritis

Plaintiff argues that had the ALJ properly considered her osteoarthritis "common sense alone" suggests that he would have further reduced Plaintiff's residual functional capacity [Dkt. 8 at 15]. The Court disagrees. The record provides no basis for suggesting that

remand for further consideration of Plaintiff's osteoarthritis might legitimately result in a conclusion that Plaintiff's osteoarthritis, considered separately or in combination, meets the definition of a medically severe impairment. *See Zeno,* 2005 WL 588223, at *6. As previously noted, the ALJ rejected Plaintiff's claim that any of her alleged hand impairments diminish Plaintiff's capacity for basic work activities to the extent Plaintiff claims [TR at 34]. The ALJ further found that Plaintiff's allegations concerning her impairments are "not entirely credible in light of objective medical findings and medical history…" *Id.* Thus, even assuming *arguendo* that the ALJ did not properly consider Plaintiff's osteoarthritis, the error is harmless. Given that the ALJ found Plaintiff's allegations to be uncredible regarding all of her alleged hand impairments, it is not conceivable that the ALJ would have reached a different result had he further considered Plaintiff's osteoarthritis.

## CONCLUSION

Based on the foregoing, the Court finds that Plaintiff's medical record provides substantial evidence to support a finding of non-disability. The ALJ properly conducted the sequential analysis, and found that Plaintiff was not disabled. Accordingly, the Commissioner's decision should be **AFFIRMED.**

**IT IS SO ORDERED.**

**SIGNED this 14th day of July, 2016.**


_____

Christine A. Nowak
UNITED STATES MAGISTRATE JUDGE